# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
### 1:09cv292

| | | |
|---|---|---|
| **RUTHERFORD COUNTY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **BOND SAFEGUARD INSURANCE CO.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court upon defendant's Motion to Dismiss (#8) and Greyrock Community Association, Inc.'s Motion to Intervene (#11). Having carefully considered defendant's Motion to Dismiss (#8) and proposed intervenor Greyrock Community Association, Inc.'s Motion to Intervene (#11) and reviewed the pleadings,[1] the court enters the following findings, conclusions, and Recommendation.

---

[1] No pleadings from the proposed intervenor have been considered on the instant Motion to Dismiss inasmuch as the proposed intervenor, Greyrock Community Association, is not yet a party to this action. The undersigned believes that the potential interests of the proposed intervenor as to the continuation of this action have been adequately represented by plaintiff.

# FINDINGS AND CONCLUSIONS

## I.  Background

This is the third case presented to this court involving a failed residential development in Rutherford County known as *Greyrock at Lake Lure*, hereinafter "Greyrock." Compl., at ¶ 4. In this action, plaintiff Rutherford County, North Carolina, seeks to recover on seven Subdivision Bonds, hereinafter "bonds." Id. Plaintiff is the named obligee under the bonds, defendant is the named surety, and the face value of the bonds is approximately $26,000,000.00. Id.  The undersigned takes notice from the previous cases that the subdivision failed after defendant herein became the surety and in spite of the fact that 400 lots were sold since defendant undertook the obligation and more than $70,000,000.00 was taken in by the developer.  It is undisputed that the development was not completed by LR Buffalo Creek, LLC, hereinafter "the developer," in accordance with written Performance Guarantee Agreements and that much of the development remains undeveloped. Id.

Plaintiff alleges that the developers abandoned the project and repudiated their obligations under the Performance Guarantee Agreements before installing the agreed-to improvements, such as roads, and later declared bankruptcy in the Middle District of Florida.  Since such abandonment of the project in 2008, plaintiff has made written demand for defendant to honor its bonds by either completing the

development or paying to plaintiff the principal amount of the bonds.  Id.

Plaintiff alleges that defendant ultimately issued bonds covering Phases I and II of Greyrock in the face amounts of $12,520.460.00 and $13,883,881.00 respectively, but did not bond Phase III of the development.  Id., at ¶¶ 13-14. Plaintiff has alleged that each bond was a contract, the developer was the principal, defendant acted as its surety, and plaintiff was the named obligee.  Id., at ¶ 15.

Completion of the subdivision improvements was governed by a Performance Guarantee Agreement (hereinafter "development agreement")between plaintiff and the developer, which was last amended March 5, 2008.  Id., at ¶ 16.  Under the last amended development agreement, the developer had until June 30, 2008, to complete the infrastructure improvements, id., at ¶ 17, and defendant issued Verification Certificates providing that "[w]e consent to the above extension of the agreement secured by this bond to January 2, 2009."  Id., at ¶ 19.  In pertinent part, the March 5, 2008, agreement provided as follows:

> [t]hat in the event that these deadlines are missed, then the Rutherford County Board of Commissioners shall have the option, in its sole discretion, to call the surety bonds for all sections for which construction is not completed regardless of whether the deadline has passed for that particular section.

Id., at ¶ 20.

Plaintiff then alleges that the developer defaulted when it failed to complete the

promised improvements by June 30, 2008. Id., at ¶ 21. The following month, the developer shut down operations, and in August 2008 plaintiff sent a letter to the developer notifying it of its default under the March 5, 2008, agreement. Id., at ¶¶ 22-23. In September 2008, the plaintiff, through resolution of its Board of Commissioners, called all the bonds issued by defendant in accordance with the March 5, 2008, agreement, id., at ¶ 24, and thereinafter sent a demand letter to defendant dated September 4, 2008, which was accompanied by a copy of the resolution. On September 25, 2008, defendant acknowledged receipt of the demand, but requested that plaintiff delay taking action for up to five months. Id., at ¶ 26. On October 30, 2008, the developer filed for Chapter 11 bankruptcy protection in the Middle District of Florida. Plaintiff alleges that despite such demand, defendant has failed to complete the improvements or pay the face amount of the bonds. Id., at ¶ 28. Further, plaintiff alleges that defendant has not begun to complete the subdivision improvements. Id., at ¶ 28 & 31.

In addition to the allegations of the Complaint, the court has also taken judicial notice of other actions filed in this court that are related to the failed Greyrock development. Soon after defendant received plaintiff's demand letter, but before it responded to defendant and sought an extension, defendant caused to be filed in this court a Complaint on September 12, 2008. In that action, Bond Safeguard Insurance

Company v. LR Buffalo Creek, LLC, 1:08-cv-00434 (W.D.N.C.), defendant herein sought indemnification on the obligations it had not yet paid to plaintiff herein from multiple parties, including the developer. It acknowledged therein that it had issued the bonds, the developer's failure to complete the infrastructure, and the demand of plaintiff herein. In that indemnification action, defendant sought to recover all amounts necessary to exonerate it from all claims under these bonds. Further, it estimated that the cost to complete the infrastructure was more than $20,000,000.00, and that it had set aside a reserve in connection with its obligations under the bonds.[2]

The court also takes judicial notice of its decision in Allen et al v. Land Resource Group of North Carolina, LLC et al, 1:09cv196 (WDNC), where this court remanded certain claims of lot owners back to the North Carolina Business Court and transferred other claims to the bankruptcy court for the Middle District of Florida. As briefly discussed above, on October 30, 2008, the developer, its parent company, and numerous affiliates, filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Middle District of Florida. The developer's bankruptcy case was jointly administered with the other cases under the caption In re Land Resource, LLC, 08-10159-Br (M.D.Fla.). The developer acknowledged in pleadings

---

[2]      The court notes that plaintiff has not called into question the solvency of defendant or the sufficiency of its reserves.

filed in the bankruptcy court that it was unable to complete development of the Grey Rock Subdivision and the bankruptcy case was filed to give it "breathing room" to sell its remaining assets in an orderly fashion and distribute the proceeds to its creditors. The developer subsequently filed a motion to sell the remaining real property which it owned in the Grey Rock Subdivision, which was primarily lots in Phase III and approximately 1,000 acres designated for a nature preserve. On January 16, 2009, defendant herein filed a conditional objection in which it asked the bankruptcy court to condition the sale of the developer's remaining property in Grey Rock upon the assumption by the successful bidder of certain obligations, which would have included the developer's obligation to construct the infrastructure improvements at the various developments. On March 20, 2009, the Bankruptcy Court overruled this objection and held that the purchasers were not "assuming obligations, if any, with regard to surety bonds issued by Bond Safeguard to Rutherford County to guarantee completion of the roads and improvements to Phases 1 and 2 of the Grey Rock Subdivision." See plaintiff's Exhibit 8 (08-10159 , Docket # 452).

The court has also considered certain matters outside the pleadings as well as determinations in related cases, to wit, the exhibits submitted by plaintiff in response

to the Rule 12(b)(1) motion.[3] On May 6, 2009, the parties to this action entered into a letter agreement whereby defendant agreed to provide a formal response to plaintiff's demand on the Bonds by no later than May 31, 2009. Plaintiff's Exhibit 10. On June 3, 2009, defendant sent plaintiff a four-page letter in which it asserted multiple alleged defenses which it contended relieved it from honoring its obligations under the subject bonds. See Plaintiff's Exhibit 12. In relevant part, defendant refused to complete the infrastructure improvements or to pay over the face amount of the bonds, stating:

> Succinctly, spending millions of dollars to build roads for a subdivision that would have no other improvements and that would have a very low likelihood of ever being habitable, appears to make little sense. Bond Safeguard has not changed its position [i.e. refusal to comply with its obligations under the Bonds].

Id. Based on such refusal dated June 3, 2009, plaintiff contends that it filed this action in this court on July 31, 2009, asserting jurisdiction under 28, United States Code, Section 1332. Plaintiff has asserted the following causes of action:

(1) First Claim for Relief: Breach of Contract / Action to Recover on a Bond - First Bond;

(2) Second Claim for Relief: Breach of Contract / Action to Recover on a Bond - Second Bond;

---

[3] See Rule 12(b)(1) standard, infra, which allows matters outside the pleadings to be considered when the subject matter jurisdiction is called into question. The exhibits submitted by plaintiff are clearly relevant to the jurisdictional issue raised by defendant.

(3)    Third Claim for Relief: Breach of Contract / Action to Recover on a Bond - Third Bond;

(4)    Fourth Claim for Relief: Breach of Contract / Action to Recover on a Bond - Fourth Bond;

(5)    Fifth Claim for Relief: Breach of Contract / Action to Recover on a Bond - Fifth Bond;

(6)    Sixth Claim for Relief: Breach of Contract / Action to Recover on a Bond - Sixth Bond; and

(7)    Seventh Claim for Relief: Breach of Contract / Action to Recover on a Bond - Seventh Bond.

## II.    Motion to Intervene

### A.    Introduction

Greyrock Community Association, Inc. (hereinafter "the Association") seeks to intervene in this action, stating in relevant part that:

> The GreyRock Planned Community will be significantly and permanently impacted by the outcome of the incident litigation, and Movant seeks to intervene in the incident action to represent the interests of the four-hundred fifty-nine (459) GreyRock Planned Community lot owners who are mandatory members of the Association.

Motion to Intervene (#11), at ¶ 4.  Disposition of such motion is governed either by Rule 24(a) if intervention is "of right" or Rule 24(b) if intervention is "permissive."

Rule 24 provides in relevant part as follows:

**Rule 24. Intervention**
**(a) Intervention of Right.**

On timely motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**(b) Permissive Intervention.**
(1) In General.
On timely motion, the court may permit anyone to intervene who:
(A) is given a conditional right to intervene by a federal statute; or
(B) has a claim or defense that shares with the main action a common question of law or fact.

\* \* \*

Fed.R.Civ.P. 24.  In this case, it appears to the undersigned that Rule 24(a)(2) provides for appropriate review of the Association's request as it claims an interest relating to the property or transactions that is the subject of this action and contends that in disposing of this action it is so situated that it may be impaired in its ability to protect its interest if not allowed to intervene.  As defendant has expressed in its response, the court is also concerned as to precisely what the Association's interest is, whether such interest is protectable in this action, and whether that interest is already adequately represented by the plaintiff.

## B.    Applicable Standard

The Court of Appeals for the Fourth Circuit has provided three inquiries for courts to make in determining whether to allow intervention as of right:

(1)     an interest sufficient to merit intervention;

(2)     that without intervention, its interest may be impaired; and

(3)     that the present litigants do not adequately represent its interests.

Virginia v. Westinghouse Electric Corporation, 542 F.2d 214, 216 (4th Cir. 1976).

Each inquiry will be addressed *seriatim*.

## C.     Sufficient Interest

The first inquiry under Westinghouse is whether the proposed intervenor has an interest sufficient to merit intervention. Where the intervenor stands "to gain or lose by the direct legal operation of the district court's judgment," the intervenor's interest in the subject matter of the litigation is significantly protectable. Teague v. Bakker, 931 F.2d 259, 261 (4th Cir. 1991). In this action, it is the proposed intervenor - - and the 459 lot owners who are mandatory members of the association - - that stands to either win or lose in this action. If these bonds are not enforced, intervenor contends that it is unlikely that the improvements will ever be built as the developer is being liquidated under Chapter 7 and its CEO has been indicted for murder in the second degree. Thus, the proposed intervenor stands to either gain or lose based on the outcome of this action, making its interest significantly protectable.

## D.     Possible Impairment of Interest

The second inquiry asks that the court consider whether, without intervention,

the proposed intervenor's legal interests may be impaired. The Association argues that its ability to function as a community is dependent upon whether defendant is required to honor its bonds, as the ability of its members to build homes and to reside in that community is dependent upon building the required infrastructure. It also argues that its ability to carry out its statutory obligation to maintain such infrastructure will be frustrated if not stymied if the bonds are not enforced and the infrastructure built. Further, the Association has raised the specter of collateral estoppel in subsequent litigation against defendant if this court determines that defendant is not obligated under the bonds. Thus, it appears to the court that there would be a possible impairment of the potential intervenor's legal interests if they were not allowed to participate in this action.

### E.    Adequate Representation

The third inquiry asks whether the present litigants adequately represent the proposed intervenor's interests. Recently, the Court of Appeals for the Fourth Circuit has provided further guidance on this element:

> Rule 24 does not specify what type of interest a party must have to intervene as a matter of right, but the Supreme Court has recognized that " '[w]hat is obviously meant ... is a significantly protectable interest.' " *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir.1991) (*quoting Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971)). When the party on whose side a movant seeks to intervene is pursuing the same result that the movant is urging, a presumption arises

that the movant's interest is adequately represented, so that the movant must show "adversity of interest, collusion, or nonfeasance." *Westinghouse Elec. Corp.*, 542 F.2d at 216. However, the movant need not show that the representation by existing parties will definitely be inadequate in this regard. *See Trbovich v. UMWA*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). Rather, he need only demonstrate "that representation of his interest 'may be' inadequate." Id. For this reason, the Supreme Court has described the applicant's burden on this matter as " 'minimal.' " *Teague*, 931 F.2d at 262 (*quoting Trbovich*, 404 U.S. at 538 n. 10, 92 S.Ct. 630).

JLS, Inc. v. Public Service Com'n of West Virginia, 2009 WL 726011, 3 (4th Cir. 2009).[4] Clearly, plaintiff is pursuing the same result that the Association would like to see, which is immediate payment of the bonds. In addition, the intervenor is most interested in seeing that the work on the infrastructure is promptly performed. For example, if the court were to allow the proposed stay advocated in the Motion to Dismiss, the proposed intervenor would be harmed in a way not countenanced by the plaintiff, which is a diminution in value as well as use and enjoyment of its members real property.

Inasmuch as plaintiff is a political subdivision of the State of North Carolina, there can be no possible showing of collusion between plaintiff and defendant or nonfeasance. Thus, the Association must make some minimal showing of adversity

---

[4]     Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation.

of interest.  Id.

Intervenor addresses *adversity* of interest in two regards: first, it discusses adversity in context with its legal duty to maintain any improvements that are made to the subdivision; and second, the lack of obligation by the county to earmark such bond money, if it is recovered herein, for actual infrastructure improvements.

First, the court has considered the proposed intervenor's obligation to eventually maintain the infrastructure that may be built by the defendant or with its funds.  It is conceivable that in the absence of the intervenor, plaintiff may compromise its claims and either take a lessor amount on the bonds or allow completion of the infrastructure in a less expensive manner that would result in greater maintenance costs for the proposed intervenor and reduce property values for its members.  If such were to occur in this case, plaintiff would clearly be in a position that is adverse to the interests of the Association.

Second, the court has considered what, if any, obligation plaintiff may have upon receipt of any bond proceeds.  While it appears undisputed that plaintiff required the bonds as a condition of the development agreement, it does not appear that the plaintiff has undertaken an explicit obligation to construct the roads and improvements with bond funds or with tax dollars if, for some reason, the bonds are not enforced herein or the work is not completed by the bonding company.  Such

concern is anticipated in intervenor's proposed tenth cause of action for declaratory relief, as the proposed intervenor points out in its supporting memorandum:

> without Intervenor-Plaintiff's claim for declaratory judgment, there would be no decision by the court regarding the responsibility of Plaintiff to use these funds for GreyRock Planned Community infrastructure. If this were the case, Plaintiff could conceivably use these funds for any number of purposes, and would not be required to use the Bonds for developing GreyRock Planned Community infrastructure, as they were intended.

Memorandum in Support (#12), at 9. While such an outcome would require the county to act in a most short-sighted manner,[5] such possible outcome is sufficiently extant as to amount to adversity of interest, especially in light of widespread budget shortfalls in county budget which could be remedied by a one-time influx in revenue. Thus, representation of the Association's interest by the county plaintiff "may be" inadequate as there exists possible adversity in interest.

## F.     Conclusion

It appearing that the proposed intervenor has made timely application to this court as issues have yet to join, and it further appearing that the proposed intervenor has made an appropriate showing upon each inquiry under Rule 24, the undersigned

---

[5] Assuming that the lots would be worth what was paid if improvements had been made, the county stands to bring in property tax revenues on property worth $92,000,000.00 if the infrastructure is completed and, perhaps, four times that amount in the event homes are actually built. If the plaintiff were to simply return the bond money to its general fund, it is likely that the land would be virtually worthless adding nothing to the county's tax base.

will respectfully recommend that the proposed intervenor's Motion to Intervene be allowed and that such party be allowed to intervene as of right as an intervenor plaintiff.

## III.  Defendant's Motion to Dismiss

Defendant has timely moved to dismiss the Complaint under Rule 12(b)(1), Federal Rules of Civil Procedure, contending that this court lacks subject matter jurisdiction.  While defendant neither challenges this court's diversity jurisdiction under Section 1332 nor contends that plaintiffs have failed to state cognizable claims under Rule 12(b)(6), defendant contends that after this suit was filed, it was granted what amounts to a reprieve by the North Carolina Legislature when that body passed Senate Bill 831 (N.C. Session Law 2009-406, not yet codified), titled "The Permit Extension Act of 2009." N.C.S.L. 2009-406, as amended by N.C.S.L. 2009-572. Plaintiff argues that

> By virtue of the Act, additional time has been given to the Developer and thus to Bond Safeguard, the Surety, which stands in the shoes of its principal, to develop the Subdivision.  Therefore, any declaration of default or any adjudication concerning the performance and completion of the Subdivision which is the subject matter of the Complaint in this action is premature.

Motion to Dismiss, at ¶ 3.  In the alternative to dismissal, defendant seeks a stay of this action up to an inclusive of December 31, 2010, as provided in the North

Carolina law.

## IV.  Rule 12(b)(1): Applicable Standard

Rule 12(b)(1) provides for dismissal where the court lacks jurisdiction over the subject matter of the lawsuit.  Lack of subject-matter jurisdiction may be raised  at any time either by a litigant or the court.  <u>Mansfield, C. & L.M.R. Co. v. Swan</u>, 111 U.S. 379, 382 (1884).  The ability of the court to independently address subject-matter jurisdiction is important to finality inasmuch as a litigant, even one who remains silent on the issue of jurisdiction, may wait until they receive an adverse judgment from a district court and raise the issue of subject-matter jurisdiction for the first time on appeal, thereby voiding the judgment.  <u>Capron v. Van Noorden</u>, 2 Cranch 126, 127, 2 L.Ed. 229 (1804).  The Federal Rules of Civil Procedure anticipate this issue and provide that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  Fed.R.Civ.P. 12(h)(3).

When a court considers its subject-matter jurisdiction, the burden of proof is on the plaintiff.  <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982).  In <u>Richmond, Fredricksburg & Potomac R.R. Co. V. United States</u>, 945 F.2d 765 (4th Cir. 1991) (Ervin, C.J.), the Court of Appeals for the Fourth Circuit held, as follows

In determining whether jurisdiction exists, the district court is to regard

the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. Id.; Trentacosta v. Frontier Pacific Aircraft Indus., 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. Trentacosta, supra, 813 F.2d at 1559 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)). The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. Trentacosta, supra, 813 F.2d at 1558. A district court order dismissing a case on the grounds that the undisputed facts establish a lack of subject matter jurisdiction is a legal determination subject to de novo appellate review. Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir.1989); Shultz v. Dept. of the Army, 886 F.2d 1157, 1159 (9th Cir.1989).

Id., at 768-69. Where jurisdictional facts are intertwined with facts central to the substance of a case, a court must find that jurisdiction exists and consider and resolve the jurisdictional objection as a direct attack on the merits of the case. United States v. North Carolina, 180 F.3d 574, 580 (4th Cir. 1999).

## V. The Act

Inasmuch as defendant's motion is based entirely on the Senate Bill 831, the undersigned will set out herein the Act in its entirety, including its official summary as that may prove to be probative:

GENERAL ASSEMBLY OF NORTH CAROLINA
SESSION 2009
SESSION LAW 2009-406
SENATE BILL 831
AN ACT to extend certain government approvals affecting the development of real property within

the State.

The General Assembly of North Carolina enacts:

**SECTION 1.** This act shall be known and may be cited as the "Permit Extension Act of 2009."

**SECTION 2.** The General Assembly makes the following findings:

(1) There exists a state of economic emergency in the State of North Carolina and the nation, which has drastically affected various segments of the North Carolina economy, but none as severely as the State's banking, real estate, and construction sectors.

(2) The real estate finance sector of the economy is in severe decline due to the creation, bundling, and widespread selling of leveraged securities, such as credit default swaps, and due to excessive defaults on sub-prime mortgages and the resultant foreclosures on a vast scale, thereby widening the mortgage finance crisis. The extreme tightening of lending standards for home buyers and other real estate borrowers has reduced access to the capital markets.

(3) As a result of the crisis in the real estate finance sector of the economy, real estate developers and redevelopers, including home builders, and commercial, office, and industrial developers, have experienced an industry-wide decline, including reduced demand, cancelled orders, declining sales and rentals, price reductions, increased inventory, fewer buyers who qualify to purchase homes, layoffs, and scaled back growth plans.

(4) The process of obtaining planning board and zoning board of adjustment approvals for subdivisions, site plans, and variances can be difficult, time consuming, and expensive, both for private applicants and government bodies.

(5) The process of obtaining the myriad of other government approvals, such as wetlands permits, treatment works approvals, on-site wastewater disposal permits, stream encroachment permits, flood hazard area permits, highway access permits, and numerous waivers and variances, can be difficult and expensive; further, changes in the law can render these approvals, if expired or lapsed, difficult to renew or reobtain.

(6) County and municipal governments, including local sewer and water authorities, obtain permits and approvals from State government agencies, particularly the Department of Environment and Natural Resources, which permits and approvals may expire or lapse due to the state of the economy and the inability of both the public sector and the private sector to proceed with projects authorized by the permit or approval.

(7) County and municipal governments also obtain determinations of master plan consistency, conformance, or endorsement with State or regional plans, from State and regional government entities that may expire or lapse without implementation due to the state of the economy.

(8) The current national recession has severely weakened the building industry, and many landowners and developers are seeing their life's work destroyed by the lack of credit and dearth of buyers and tenants due to the crisis in real estate financing and the building industry, uncertainty over the state of the economy, and increasing levels of unemployment in the construction industry.

(9) The construction industry and related trades are sustaining severe economic losses, and the lapsing of government development approvals would exacerbate, if not addressed, those losses.

(10) Financial institutions that lent money to property owners, builders, and developers are experiencing erosion of collateral and depreciation of their assets as permits and approvals expire, and the extension of these permits and approvals is necessary to maintain the value of the collateral and the solvency of financial institutions throughout the State.

(11) Due to the current inability of builders and their purchasers to obtain financing under existing economic conditions, more and more once-approved permits are expiring or lapsing, and, as these approvals lapse, lenders must reappraise and thereafter substantially lower real estate valuations established in conjunction with approved projects, thereby requiring the reclassification of numerous loans, which, in turn, affects the stability of the banking system and reduces the funds available for

future lending, thus creating more severe restrictions on credit and leading to a vicious cycle of default.

(12) As a result of the continued downturn of the economy and the continued expiration of approvals that were granted by State and local governments, it is possible that thousands of government actions will be undone by the passage of time.

(13) Obtaining an extension of an approval pursuant to existing statutory or regulatory provisions can be both costly in terms of time and financial resources and insufficient to cope with the extent of the present financial conditions; moreover, the costs imposed fall on the public as well as the private sector.

(14) It is the purpose of this act to prevent the wholesale abandonment of already approved projects and activities due to the present unfavorable economic conditions by tolling the term of these approvals for a finite period of time as the economy improves, thereby preventing a waste of public and private resources.

**SECTION 3.** Definitions. As used in this act, the following definitions apply:

(1) Development approval. Any of the following approvals issued by the State, any agency or subdivision of the State, or any unit of local government, regardless of the form of the approval, that are for the development of land or for the provision of water or wastewater services by a government entity:

a. Any detailed statement by a State agency under G.S. 113A-4.

b. Any detailed statement submitted by a special purpose unit of government or a private developer of a major development project under G.S. 113A-8.

c. Any finding of no significant impact prepared by a State agency under Article 1 of Chapter 113A of the General Statutes.

d. Any approval of an erosion and sedimentation control plan granted by a local government or by the North Carolina Sedimentation Control Commission under Article 4 of Chapter 113A of the General Statutes.

e. Any permit for major development or minor development, as defined in G.S.113A-118, or any other permit issued under the Coastal Area Management Act (CAMA), Part 4 of Article 7 of Chapter 113A of the General Statutes.

f. Any water or wastewater permit issued under Article 10 or Article 11 of Chapter 130A of the General Statutes.

g. Any building permit issued under Article 9 of Chapter 143 of the General Statutes.

h. Any nondischarge or extension permit issued under Part 1 of Article 21 of Chapter 143 of the General Statutes.

i. Any stream origination certifications issued under Article 21 of Chapter 143 of the General Statutes.

j. Any water quality certification under Article 21 of Chapter 143 of the General Statutes.

k. Any air quality permit issued by the Environmental Management Commission under Article 21B of Chapter 143 of the General Statutes.

l. Any approval by a county of sketch plans, preliminary plats, plats regarding a subdivision of land, a site specific development plan or a phased development plan, a development permit, or a building permit under Article 18 of Chapter 153A of the General Statutes.

m. Any approval by a city of sketch plans, preliminary plats, plats regarding a subdivision of land, a site specific development plan or a phased development plan, a development agreement, or a building permit under Article 19 of Chapter 160A of the General Statutes.

n. Any certificate of appropriateness issued by a preservation commission of a city under Part 3C of Article 19 of Chapter 160A of the General Statutes.

(2) Development. The division of a parcel of land into two or more parcels, the construction, reconstruction, conversion, structural alteration, relocation, or enlargement of any building or other structure or facility, or any grading, soil removal or relocation, excavation or landfill, or any use or

change in the use of any building or other structure or land or extension of the use of land.

**SECTION 4.** For any development approval that is current and valid at any point during the period beginning January 1, 2008, and ending December 31, 2010, the running of the period of the development approval and any associated vested right under G.S. 153A-344.1 or G.S. 160A-385.1 is suspended during the period beginning January 1, 2008, and ending December 31, 2010.

**SECTION 5.** This act shall not be construed or implemented to:

(1) Extend any permit or approval issued by the United States or any of its agencies or instrumentalities.
(2) Extend any permit or approval for which the term or duration of the permit or approval is specified or determined pursuant to federal law.
(3) Shorten the duration that any development approval would have had in the absence of this act.
(4) Prohibit the granting of such additional extensions as are provided by law.
(5) Affect any administrative consent order issued by the Department of Environment and Natural Resources in effect or issued at any time from the effective date of this act to December 31, 2010.
(6) Affect the ability of a government entity to revoke or modify a development approval pursuant to law.
(7) Modify any requirement of law that is necessary to retain federal delegation by the State of the authority to implement a federal law or program.

**SECTION 6.** Within 30 days after the effective date of this act, each agency or subdivision of the State to which this act applies shall place a notice in the North Carolina Register listing the types of development approvals that the agency or subdivision issues and noting the extension provided in this act. This section does not apply to units of local government.

**SECTION 7.** The provisions of this act shall be liberally construed to effectuate the purposes of this act.

**SECTION 8.** This act is effective when it becomes law.

In the General Assembly read three times and ratified this the 30th day of July, 2009.
s/ Walter H. Dalton
President of the Senate
s/ Joe Hackney
Speaker of the House of Representatives
s/ Beverly E. Perdue
Governor
Approved 2:05 p.m. this 5th day of August, 2009

N.C.S.L. 2009-406. While Session Law 2009-406 was approved on August 5, 2009, it appears to have been amended on August 28, 2009, by Session Law 2009-572. The relevant amendment in Session Law 2009-572 makes clear that development

agreements entered into by counties are covered by the Act.[6]  In parts relevant to this

action, such amendment provides as follows:

> Sub-subdivisions l. and m. of subdivision (1) of Section 3 of S.L. 2009-406 read as rewritten:
> l. Any approval by a county of sketch plans, preliminary plats, plats regarding a subdivision of land, a site specific development plan or a phased development plan, a development permit, **a development agreement**, or a building permit under Article 18 of Chapter 153A of the General Statutes.

N.C.S.L. 2009-572 (emphasis in the original indicating an addition to the text of S.L.

2009-406).   The undersigned finds this to be a pertinent addition inasmuch as it has

been alleged herein that it was the failure of the developer to complete the

improvements within the time provided in the amended *development agreement* that

purportedly resulted in demand being made on the bonds.  Finally, it is undisputed

that N.C.S.L. 2009-406 and N.C.S.L. 2009-572 became effective after this action was

filed.

## VI.    Discussion of Motion to Dismiss

### 1.    Introduction

As discussed in the context of the Rule 12(b)(1) standard, it is plaintiff's

burden to prove to the court that subject matter jurisdiction exists.   Plaintiff has

responded to defendant's argument that the case should be dismissed or stayed,

contending that:

---

[6]    It appears from close review of N.C.S.L. 2009-406 that the Legislature simply omitted "development agreements" from the section dealing with counties inasmuch as the term "development agreements" was included in the section dealing with municipalities.

(1)      subject matter jurisdiction (what plaintiff describes as "ripeness") is determined on the date a complaint is filed and is not affected by subsequent changes in the law;

(2)      the Permit Extension Act of 2009 cannot be applied retroactively to divest Rutherford County of its vested breach of contract cause of action;

(3)      defendant is barred from asserting defenses available only to the principal because the principal is not a defendant in this litigation;

(4)      the principal's obligations under the Performance Guarantee Agreements have been rejected in bankruptcy;

(5)      the principal has repudiated and anticipatorily breached the Performance Guarantee Agreements; and

(6)      this matter is ripe for adjudication.

Having carefully considered the well reasoned briefs of all parties, the undersigned concludes that plaintiff's first argument is dispositive of the Rule 12(b)(1) issue and that, for the reasons that follow, reaching plaintiff's other arguments would be premature. Defendant's contention that subject matter jurisdiction, which was present when this action was filed, can later be divested by a new law finds no legal support; rather, defendant's contention is better considered (1) at trial as a defense to the alleged breach, or (2) on summary judgment as a "failure of proof," to wit, that plaintiff will be unable to prove breach because the time for performance has not yet run. In either case, the jurisdictional facts appear to be so intertwined with facts central to the substance of a case, the undersigned must find that jurisdiction exists and

recommend that defendant's objection be later considered and resolved, if properly raised, as a direct attack on the merits of the case.  United States v. North Carolina, supra.

## 2. The Permit Extension Act of 2009

As is made clear in the Legislature's introductory findings, the intent of the Permit Extension Act of 2009 is to allow developers additional time to complete previously approved projects without requiring them to reapply for certain permits or other authorizations from municipal, county, and state authorities.  The underlying reason for such legislation is equally clear from the language of the statute: the stagnation in the residential and commercial real estate market brought on by the global economic crisis of 2008 and manifesting itself in a lack of consumer confidence, especially in the real estate market.  As the Legislature found, developers and developments were failing simply because they had no interested buyers.

Based on such identified problem, the North Carolina Legislature created what appears to be a stop-gap measure to allow developers extra time, while the economy recovered, to complete their developments without having to reapply for permits that would expire during the downturn:

> For any development approval that is current and valid at any point during the period beginning January 1, 2008, and ending December 31, 2010, the running of the period of the development approval and any

associated vested right under G.S. 153A-344.1 or G.S. 160A-385.1 is suspended during the period beginning January 1, 2008, and ending December 31, 2010.

N.C.S.L. 2009-406.  Thus, the Permit Extension Act of 2009 extended extant permits and apparently revived certain lapsed permits along with "associated vested rights."

A "vested right" is defined by Chapter 153A-344.1 of the North Carolina General Statutes as

the right to undertake and complete the development and use of property under the terms and conditions of an approved site specific development plan or an approved phased development plan.

N.C.Gen.Stat. 153A-344.1 (b)(6).  Such rights, while vested, can be lost: Chapter 153A-344.1(c) provides that "failure to abide by such terms and conditions will result in a forfeiture of vested rights." Id. The court takes particular notice of the legislature's use of the word "associated" in conjunction with the words "vested rights," and assumes  that the legislature used "associated vested rights" rather than just "vested rights" for a straightforward reason: the Legislature intended to limit the "vested rights" extended by the legislation to those "associated" with  the "running of any permitted period."  In the context of permits issued by a county, this Session Law, therefore,  suspends the running of any permitted period[7] and the expiration of any

_____

[7]     For "any development approval that is current and valid at any point during the period beginning January 1, 2008, and ending December 31, 2010." N.C.S.L. 2009-406.

associated vested right, to wit, "the right to undertake and complete the development," until December 31, 2010.

Thus, the language of Session Law 2009-406 is entirely consistent with both the preamble of the Act and the official title, which provide in relevant part, as follows:

> AN ACT to extend certain government approvals affecting the development of real property within the State.
> * * *
> This act shall be known and may be cited as the "Permit Extension Act of 2009."

N.C.G.S. 2009-406.

### 3.      Divestiture of Subject Matter Jurisdiction

Defendant argues that this legislation divests the court of jurisdiction because the time for the developer to complete the project has not run, and, with the departure of the developer, it as surety stands in the shoes of the developer and enjoys the extension of the development agreement until December 31, 2009.  While defendant may later prove this theorem correct, review of the Permit Extension Act of 2009 reveals no indication that the Legislature intended to divest courts of subject matter jurisdiction as to causes of actions for breach of performance bond or subdivision bond contracts.

No where in the Permit Extension Act does the Legislature mention that such Act was intended to suspend the right of developers or permitting authorities to

resolve disputes in court. <u>See</u> N.C.S.L. 2009-406 and N.C.S.L. 2009-572. While the Act patently extends the expiration of vested rights associated with the running of the period of the development approval under Chapter 153A-344.1, it does not speak to those vested rights which may have been lost through forfeiture due to abandonment of a project, repudiation, or anticipatory breach of the development agreement. <u>Id.</u> Indeed, the Permit Extension Act does not purport to modify the portions of Chapter 153A-344.1 that provide for loss of vested rights due to "failure to abide by such terms and conditions . . . " of the agreement. <u>Id.</u>

Further, the Act makes no mention of sureties or bonds, its impact on extant causes of action, the effect on ongoing litigation, whether it cures breaches of contracts, or whether such legislative extension of the permit period and associated vested rights would *require* sureties to provide coverage during the period of extension or whether the issuing county or municipality would be required to obtain an agreement as to an extension from the surety. While defendant has certainly come forward with an argument under the common law that it stands in the principal's shoes, the questions raised as to the applicability of the Permit Extension Act of 2009 to those other than developers provides a clear indication that proof and discovery beyond the realm of Rule 12(b)(1) may well be necessary to determine whether the Act provides "breathing room" to sureties in addition to developers. To find that the

Permit Extension Act of 2009 is an absolute bar to litigation or requires a stay of litigation in the circumstances presented herein would require an even greater reach.

What is not stated in a statute can speak volumes as to the intent of the legislation. If the Legislature intended to cure breached development agreements in addition to expired development agreements, if it had wished to bar prosecution of development bonds, or if it had desired to restore *all* vested rights, it could have done so. Such retroactive tinkering with all vested contractual rights, including the right to sue for breach, would have; however, raised the specter of running afoul of the *Contract Clause* of Article I, Section 10 of the United States Constitution and the *Law of the Land Clause* in Article I, Section 19 of the North Carolina Constitution. Instead, the language of the Act provides that it simply extends certain development permits and "*associated* vested rights" to a date certain. Such a reading is in no way offensive to either the federal or state constitutions.

Asserted as a defense to plaintiff's claims of breach of contract rather than a bar to prosecution, defendant could reasonably argue that it is has not yet breached the bonds because it has until December 31, 2010, to complete the work, insofar as it stands in the shoes of the principal. Likewise, plaintiff could respond to this defense and attempt to proving that even the developer, in whose shoes defendant purportedly

stands,[8] would not enjoy the benefits of the Permit Extension Act of 2009 because it forfeited vested rights that were not associated with the permitted time through abandonment of the project, repudiation, or some other reason. Further, plaintiff could attempt to prove that even if any vested rights enured to the benefit of defendant, such were forfeited by defendant under Chapter 153A-344.1(c) when it allegedly refused on June 3, 2009, to honor its bonds.

The issue comes squarely down to whether subject matter jurisdiction, once properly laid as it was in this case, can be later divested by a new law that was not in effect when the action was filed. The reported case law that the undersigned could find advises that subject matter jurisdiction once invoked cannot be divested by a new law:

> Since ripeness is determined as of the date of filing the action, a subsequent change in the law cannot defeat the Court's jurisdiction on ripeness grounds. While it is tempting to view the situation as analogous to a lack of ripeness, it is better characterized as a failure of proof.

Bradley v. Work, 916 F.Supp. 1446, 1464 (S.D.Ind. 1996). While Bradley dealt with changes in the law in a voting rights case, the undersigned finds that the subsequent change in the law here also cannot operate to defeat jurisdiction as defendant suggests.

---

[8]     The undersigned sees no need to engage in the common law debate, prior to joinder of issues, as to whether a surety stands in the shoes of a principal that no longer exists or is not capable of being joined.

This is not to say that the Permit Extension Act of 2009 may not be a basis for some relief for defendant. As <u>Bradley</u> makes clear, a change in the law is better considered as a "failure of proof," <u>id.</u>, and is better presented in the form of a motion for summary judgment, where defendant could argue that plaintiff cannot now show breach, or at trial as an affirmative defense to breach. In either case, such change in the law should be considered as a failure in proof rather than a bar to prosecution.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that the proposed intervenor's Motion to Intervene (#11) be **ALLOWED** and that Greyrock Community Association, Inc., be allowed to intervene as of right as an intervenor plaintiff.

**IT IS, FURTHER, RESPECTFULLY RECOMMENDED** that defendant's Motion to Dismiss (#8) be **DENIED,** but that such denial be without prejudice as to raising the Permit Extension Act of 2009 in support of a motion for summary judgment or as an affirmative defense, if such can be done in accordance with Rule 11, Federal Rules of Civil Procedure.

The parties and proposed intervenor are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact,

conclusions of law, and recommendation contained herein must be filed within fourteen (**14**) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984).

Signed: December 3, 2009

Dennis L. Howell
United States Magistrate Judge